IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ARTHUR GAVLOCK, ADAM     :
WALTZ, JAMES P. PLETCHER,  :
ROBERT FLOYD, and         :   No. 4:04-CV-0247
JEAN FLOYD,               :
        Plaintiffs,     :
                    :   (McClure, J.)
     v.              :
                    :
WCO CLINT DENIKER, WCO   :
WASSERMAN, WCO DOTY     :
MCDOWELL, SUPERVISOR     :
RONALD STOUT, and        :
VERNON ROSS,            :
        Defendants.    :

**M E M O R A N D U M**

May 27, 2005

**BACKGROUND:**

Plaintiffs Arthur Gavlock, Adam Waltz, James P. Pletcher, Robert Floyd, and Jean Floyd initiated this civil rights action on February 3, 2004 by filing a complaint under 42 U.S.C. § 1983 alleging violations of the First, Fourth, and Fourteenth Amendments to the United States Constitution against five defendants, all of whom are officials of the Pennsylvania Game Commission (PGC): Executive Director Vernon Ross, Federal Aid Officer/Wildlife Conservation Officer (WCO) Supervisor Ronald Stout, and WCO's Clint Deniker, John Wasserman, and Doty

-1-

McDowell.  Plaintiffs' claims stem from a June 3, 2003 incident in which Robert
Floyd shot and killed an elk on his property that was hungrily eyeing his apple trees.
The elk was allegedly killed in violation of the Pennsylvania Game and Wildlife
Code, 34 Pa. C.S.A. § 101 et seq., which prohibits the unjustified, unlicensed, out-
of-season killing of wildlife.  Plaintiffs allege that defendants violated their civil
rights while investigating the shooting and while searching for the firearm allegedly
used to kill the elk.

Now before the court is defendants' motion for summary judgment.  For the
following reasons, the court will grant the motion.


**DISCUSSION:**

### I. The Summary Judgment Standard

Summary judgment is appropriate if there are no genuine issues of material
fact in dispute and if the moving party is entitled to judgment as a matter of law.
Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986);
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Beers-Capitol v.
Whetzel, 256 F.3d 120, 130 n.6 (3d Cir. 2001).

An issue is "genuine" if a reasonable jury could find for either party.  See
Anderson, 477 U.S. at 249.  "Material" facts are those that might affect the

outcome of the case.  Id. at 248.

Initially, the moving party bears the burden of stating the basis for its motion

and identifying those portions of the record which demonstrate the absence of a

genuine issue of material fact.  Celotex, 477 U.S. at 323.  "It can discharge that

burden by 'showing'--that is, pointing out to the district court--that there is an

absence of evidence to support the nonmoving party's case."  Id. at 325.

Once the moving party points to evidence demonstrating that no genuine

issue of material fact exists, the nonmoving party has the duty to set forth specific

facts showing that a genuine issue of material fact does exist and that a reasonable

fact-finder could rule in its favor.  Ridgewood Bd. of Educ. v. N.E., ex rel. M.E.,

172 F.3d 238, 252 (3d Cir. 1999) (citing Matsushita Elec. Indus. Co. v. Zenith

Radio Corp., 475 U.S. 574, 587 (1986)).  Although "[s]peculation and conclusory

allegations do not satisfy this duty,"  Ridgewood, 172 F.3d at 252 (citing Groman

v. Township of Manalapan, 47 F.3d 628, 637 (3d Cir. 1995)), all inferences are

made in a light most favorable to the nonmoving party.  See Saucier v. Katz, 533

U.S. 194, 201 (2001); Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir.

2004).

## II. Statement of Relevant Facts

We briefly recite the relevant, material facts.  To the extent the parties

-3-

disagree over the factual details, we draw all inferences in a light most favorable to plaintiffs, the nonmoving parties.

The series of events precipitating this action really date back to about 1913. Thereabouts, a group of elk was brought to Pennsylvania, the roughly 700 descendants of which currently roam in Elk, Cameron, and Clinton Counties, and possibly in Jefferson and Centre Counties as well.  (Defs.' Stmt. of Facts, Rec. Doc. No. 12, at ¶1.)  Now move forward about 85 years.  In late 1998, the Pennsylvania Game Commission (PGC), which is charged with enforcing the Pennsylvania Game and Wildlife Code, 34 Pa. C.S.A. § 101 et seq.,[1] instituted a trap and transfer program in which they moved about 20 to 25 elk from Elk County into areas of Clinton County.  (Rec. Doc. No. 12, at ¶3.)  This program irked some citizens of Clinton County because elk can cause substantial property damage.  The PGC attempted to ease human-elk tensions in Clinton County in various ways, such as by providing property owners with cracker shells and rubber shot bullets to scare the animals away, employing chemical deterrents, darting animals to tranquilize and then remove them from a location, hiring biologists to track problem animals, and offering fencing programs to landowners.  (Id. at ¶6.)  Some Clinton

---

[1]  For specific provisions pertaining to the PGC, see generally 34 Pa. C.S.A. §§ 301-328.

County residents, though, felt that these measures failed to deal adequately with the problem. As a result, in 1999, some residents, including plaintiffs Adam Waltz, Arthur Gavlock, and James Pletcher, formed Citizens Against the Exploitation of Private Property Rights (CAEPPR). Seeking to prevent elk destruction of private property, CAEPPR advocated fencing in thousands of acres of state land to keep elk from roaming onto private property. (Id. at ¶11.) Plaintiff Robert Floyd attended two CAEPPR meetings, although he does not think anyone knew he was a member of CAEPPR. (Id. at ¶¶26-27.)

In the past, the PGC had offered CAEPPR members, including Waltz, Gavlock, Pletcher, and Robert Floyd, deterrents such as rubber shot and cracker shells as well as fencing. Some individuals, including some of the plaintiffs, questioned the effectiveness of these deterrents and declined fencing. (Id. at ¶¶14-16, 18-24, 28.)

Since 1999, Waltz has shot and killed about nine elk on his property. He contacted the PGC each time to remove the elk. The PGC removed all the elk and never had any problem with Waltz, because he raises produce and crops for a living and is therefore entitled to shoot elk under 34 Pa. C.S.A. § 2121, which permits persons who cultivate land as a primary means of gaining a livelihood to shoot wildlife in certain circumstances. (Id. at ¶22.) Gavlock has never contacted

the PGC about specific incidents of property damage caused by elk.  (Id. at ¶14.)

On June 5, 2003, Robert Floyd shot an elk on his property that was hungrily eyeing his apple trees.  After shooting the elk, Robert Floyd called Waltz, who in turn called Pletcher, Thomas Shearer, and Robert Peno to rendevous at the Floyd residence.  Upon arriving at the Floyd residence, Waltz anonymously called the PGC and asked that someone remove the elk carcass.  Officers Deniker and McDowell responded to the call.  Upon arriving at the scene, Waltz said he spoke for the Floyds and that the Floyds did not want to talk, nor were they coming out, and that the officers were not going into the Floyds' home.  Waltz also handed Deniker the business card of Craig Miller, Esq., and said that attorney Miller represented the Floyds and that the officers should speak with him.  (Id. at ¶¶29-30, 35.)

Officers Deniker and McDowell indicated they were going to investigate the killing of the elk and wanted to speak with the Floyds.  As the officers proceeded to the outer door of the Floyd residence, Waltz got to the door first and attempted to shut it.  Deniker blocked the door from closing with his hand and reiterated he needed to speak with Robert Floyd.   Waltz repeated that the Floyds did not wish to be bothered and that Deniker should speak with attorney Miller.  (Id. at ¶¶37-38, 42-43.)

Waltz then began walking toward the inner door of the house.  As he did so, Deniker grabbed Waltz from behind initially in a "bear hug."  Waltz yelled "let go" and tried to get loose.  Once Waltz stopped resisting, Deniker released him and told Waltz he was interfering with a PGC investigation.  Deniker then knocked on the inner door but was unable to make contact with the Floyds because they refused to answer.  (Id. at ¶¶45-47, 51.)

Failing to make contact with the Floyds, the officers proceeded to remove the elk carcass.  Later analysis of the carcass revealed the caliber of bullet that kill the elk and what types of firearms could have fired the bullet.  (Id. at ¶¶51, 59.)

Later, on June 15, 2003, Robert Floyd sent a notarized letter to the PGC in which he admitted to shooting the elk and stated that the PGC should contact his attorney, Miller.  Officer Wasserman was assigned to the investigation.  Wasserman spoke with attorney Miller in an attempt to obtain the firearm used to kill the elk. After two discussions, attorney Miller told Wasserman that he no longer represented the Floyds and that he did not have the firearm.  (Id. at ¶¶59, 60-67.)

Sometime between or after these two discussions, attorney Miller informed Waltz and Gavlock, who in turn informed Robert Floyd, that Wasserman would likely get a search warrant for the firearm.  To avoid turning over the firearm, Robert Floyd signed a sales agreement selling his Parker Hale 30-06 to Gavlock for

-7-

one dollar with a buyback option at the same price.  His wife Jean Floyd and Waltz signed the agreement as "witnesses."  The intent of the agreement was to keep the firearm from the authorities.  (Id. at ¶¶68-69, 80-81.)

On July 29, 2003, Wasserman filed a summary citation against Floyd charging him with a violation of 34 Pa. C.S.A. § 2307.[2]  It was served by mail. Shortly thereafter, on August 6, 2003, Wasserman obtained a warrant to search the Floyd residence for the firearm.  He executed the search warrant the next day. While executing the search warrant for the Floyd residence, Jean Floyd informed Wasserman about the sales agreement and the purposes behind it.  The firearm was not found at the Floyd residence.  (Id. at ¶¶72-73, 77, 79-81.)

After Wasserman left her home, Jean Floyd called Waltz about the search. Waltz called Gavlock and Pletcher.  Very shortly after the search, Wasserman observed Gavlock riding along as a passenger of Pletcher's in Pletcher's vehicle. Wasserman followed them to Waltz's residence.  He asked to speak with Gavlock,

---

[2] Section 2307(a) provides:
It is unlawful for any person to aid, abet, attempt or conspire to hunt for or take or possess, use, transport or conceal any game or wildlife unlawfully taken or not properly marked or any part thereof, or to hunt for, trap, take, kill, transport, conceal, possess or use any game or wildlife contrary to the provisions of this title.

but Gavlock ignored Wasserman and entered Waltz's residence.  Wasserman

positioned himself across the road to surveil the residence and radioed for

assistance.  When Deniker and Supervisor Ronald Stout arrived, Wasserman left to

obtain search warrants for Gavlock's home and Pletcher's vehicle because he

believed Gavlock, as the "purchaser" of the firearm, either had it at his home or

was transporting it in Pletcher's vehicle after Jean Floyd tipped them off about the

earlier search of her home.  (Id. at ¶¶83-85, 87-88, 97-98.)

Meanwhile, Deniker and Stout observed several other CAEPPR members

and others arrive at Waltz's home.  People came and went to Waltz's home without

the surveilling officers stopping or otherwise preventing them from leaving.  (Id. at

¶¶90-93.)

Wasserman later returned and executed the search warrant for Pletcher's

vehicle but did not find the firearm.  Wasserman then executed the search warrant

on Gavlock's residence with Deniker and Stout but they did not find the firearm.

(Id. at ¶¶97-98, 101, 103.)  The firearm was never found.

Robert Floyd entered a not guilty plea to the summary offense on August 1,

2003.  On September 26, 2003, Robert Floyd was found not guilty of the summary

offense because of his age and because of the district justice's belief that Floyd

may have been influenced by others, not because he did not shoot the elk.  Since

these events, CAEPPR members have continued to voice their opposition to the

PGC's elk program, and have not felt as though they have been prohibited from

doing so.  (Id. at ¶¶72, 104, 112.)

### III. Defendants' Arguments

We address the issues in the order presented by the parties, to wit:

1) Does Robert Floyd have a constitutional right under the Fourteenth Amendment to kill any elk which causes property damage, and if so was that right infringed?
2) Was Robert Floyd the victim of "malicious prosecution" in violation of the Fourth or Fourteenth Amendments?
3) Did probable cause exist to search the Floyds' residence, Gavlock's residence, and Pletcher's vehicle?
4) Was Waltz the victim of excessive force in violation of the Fourth Amendment?
5) Were Waltz, Gavlock, and Pletcher unlawfully imprisoned on Waltz' property in violation of the Fourth Amendment?
6) Did defendants retaliate against plaintiffs for their speech opposing the PGC's elk program, in violation of the First Amendment?
7) Do plaintiffs state any claim against PGC Executive Director Ross?
8) Are any defendants entitled to qualified immunity?

### 1. Right to Kill Elk

The parties initially spar over whether Robert Floyd had a federal

constitutional right to kill an elk causing or about to cause property damage to his

apple trees.  We address this issue in the context of Floyd's malicious prosecution

claim, see infra Part III.2.

### 2. Malicious Prosecution

Plaintiff Robert Floyd alleges through 42 U.S.C. § 1983 that he was the

victim of malicious prosecution by virtue of his receiving a summary citation for

killing an elk.  A plaintiff must show the following to succeed on a § 1983 malicious

prosecution claim:

> (1) the defendants initiated a criminal proceeding; (2) the criminal
> proceeding ended in plaintiff's favor; (3) the proceeding was initiated
> without probable cause; (4) the defendants acted maliciously or for a
> purpose other than bringing the plaintiff to justice; and (5) the plaintiff
> suffered deprivation of liberty consistent with the concept of seizure as
> a consequence of a legal proceeding.

Estate of Smith v. Marasco, 318 F.3d 497, 521 (3d Cir. 2003) (citing Donahue v.

Gavin, 280 F.3d 371, 379-80 (3d Cir. 2002)).  The first two elements are not in

dispute.  Instead the parties spar over the remaining three elements.  The parties

initially focus on the fifth element, whether Robert Floyd suffered any deprivation

of liberty.  Floyd argues he was deprived of his liberty to kill elk intruding on his

property in violation of his Fourth and Fourteenth Amendment rights.

Robert Floyd argues that the Fourteenth Amendment affords him the right to

shoot elk encroaching on his property.  Presumably, such a right would be a liberty

or property interest protected by the substantive due process guarantee of the Due

Process Clause of the Fourteenth Amendment.  However, regardless of the

contours of this alleged right, Robert Floyd's claim fails because a malicious

prosecution claim cannot be based on substantive due process.  See Albright v.

Oliver, 510 U.S. 266, 275 (1994) (plurality); DiBella v. Borough of Beachwood, –

F.3d –, 2005 WL 1118012, at *2 (3d Cir. May 12, 2005).[3]

    Floyd also claims he suffered a deprivation of liberty consistent with the

-----

[3]  Moreover, killing an elk, even an elk hungrily eyeing one's apples, is not a
fundamental right so deeply rooted in our concept of ordered liberty that it could
be considered a liberty interest protected by the substantive due process guarantee
of the Fourteenth Amendment.  See Christy v. Hodel, 857 F.2d 1324, 1330 (9th
Cir. 1988), cert. denied, 490 U.S. 1114 (1990); see also Baldwin v. Fish & Game
Comm'n of Montana, 436 U.S. 371, 388-89 (1978) (elk hunting by nonresidents
not fundamental right under Privileges and Immunities Clause of the Constitution,
Article 4, § 2, cl. 1).  Ownership of land, on the other hand, "is a property interest
worthy of substantive due process protection."  See DeBlasio v. Zoning Bd. of
Adjustment for the Township of W. Amwell, 53 F.3d 592, 600 (3d Cir. 1995),
overruled in part on other grounds, United Artists Theatre Circuit, Inc. v. Township
of Warrington, 316 F.3d 392 (3d Cir. 2003).  That property interest, though, does
not extend to killing elk that could cause property damage.  See Mountain States
Legal Foundation v. Hodel, 799 F.2d 1423, 1430-31 (10th Cir. 1986) (no
entitlement to compensation for damage to property caused by wildlife under
takings clause of Fifth Amendment).
    At best, Floyd has a qualified state right to protect his property from damage
done by wildlife under the Pennsylvania law.  See 34 Pa. C.S.A. § 2121 (permitting
persons who cultivate, as a primary means of gaining a livelihood, to kill game or
wildlife); Commonwealth v. Hagan, 44 Pa. D&C 4th 516, 548-59 (Elk County Ct.
2000) (creating common law exception for killing game or wildlife if "reasonable
necessity" or "justification" exists).  In some narrow instances, a state-created
property right may qualify as a property interest protected by the substantive due
process guarantee of the Fourteenth Amendment.  See Hoffman v. Lehman, 926 F.
Supp. 510, 513 (M.D. Pa. 1996) (Rambo, J.).  We need not determine if this is
such an instance because, again, a violation of substantive due process is no basis
for a § 1983 malicious prosecution claim.

Fourth Amendment's concept of seizure when he received a summary citation for

shooting the elk and was required to attend trial on the summary offense.  The

Third Circuit recently addressed a very analogous situation in <u>DiBella</u>.  The

plaintiffs in <u>DiBella</u> received summonses for defiant trespass, a petty disorderly

offense under New Jersey law, and were required to attend trial on the charge.

2005 WL 1118012, at *1.  They were convicted, but those convictions were

eventually reversed.  <u>Id.</u>  The plaintiffs then brought § 1983 malicious prosecution

claims against the arresting authority in federal court.  <u>Id.</u>  A jury returned a verdict

in favor of plaintiffs, but the district court vacated the jury award on the ground that

the plaintiffs were never "seized" in violation of the Fourth Amendment for

purposes of their § 1983 malicious prosecution claims.  <u>Id.</u>  The Third Circuit

affirmed, holding that "[a]ttending one's trial is not a government "seizure" in a 42

U.S.C. § 1983 malicious prosecution action for violation of the Fourth

Amendment."  <u>Id.</u> at *4.

Just like the plaintiffs in <u>DiBella</u>, Robert Floyd was charged with a minor

offense and was required to attend trial.  Such minimal restraints of liberty do not

amount to a Fourth Amendment "seizure."  <u>Id.</u>  Accordingly, we find that Robert

Floyd was not sufficiently deprived of his liberty so as to constitute a violation of

the Fourth Amendment.  Robert Floyd's malicious prosecution clam therefore fails

because he cannot establish that he was deprived of a constitutionally protected liberty.

Even if we were to find that Robert Floyd suffered an unconstitutional deprivation of liberty, we would find that he fails to satisfy the third element necessary to establish a § 1983 malicious prosecution claim, viz., that the proceeding was initiated against him without probable cause. "'[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested.'" Marasco, 318 F.3d at 514 (quoting Orsatti v. New Jersey State Police, 71 F.3d 480, 482 (3d Cir. 1995)). Probable cause is typically a jury question. Marasco, 318 F.3d at 514. Nonetheless, "a district court may conclude 'that probable cause did exist as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding,' and may enter summary judgment accordingly." Id. (quoting Sherwood v. Mulvihill, 113 F.3d 396, 401 (3d Cir. 1997)).

The undisputed material facts show that Robert Floyd shot the elk, that plaintiff Waltz contacted the PGC to report that Robert Floyd had shot the elk, and that the elk was found shot dead on Robert Floyd's property. (See Rec. Doc. No.

12, at ¶¶25, 30, 33.)  Also undisputed are the facts that Robert Floyd shot the elk

outside permissible elk hunting periods without a license, and that Floyd refused to

speak with officer Deniker about the incident.  (Id. at ¶¶38, 51, 104.)  Given

Floyd's lack of cooperation, Deniker had no reason to believe the elk was shot with

justification under either 34 Pa. C.S.A. § 2121 or Hagan.  The totality of these

circumstances would lead a prudent officer in Deniker's position to conclude that

Robert Floyd had violated § 2307 and that the issuance of the summary citation

under that section was appropriate.  For these reasons, we believe no reasonable

jury could find that proceedings were initiated against Robert Floyd without

probable cause.

In sum, Robert Floyd fails to establish the third and fifth elements necessary

to make out a § 1983 malicious prosecution claim.  Accordingly, we will grant

summary judgment for defendants on Floyd's malicious prosecution claim.

## 3. The Searches of the Floyds' Residence, Arthur Gavlock's Residence, and James Pletcher's Vehicle

Plaintiffs Robert and Jean Floyd, Gavlock, and Pletcher claim the search

warrants to search their residences and vehicle for the firearm used to kill the elk

lacked probable cause.  A search warrant must be supported by probable cause to

satisfy the Fourth Amendment.  See United States v. Harris, 403 U.S. 573, 577

(1971).  Probable cause exists if there is "fair probability that contraband or evidence of a crime will be found in a particular place."  See Illinois v. Gates, 462 U.S. 213, 238 (1983).  Search warrants should be upheld so long as the issuing authority had a substantial basis for finding probable cause.  See Gates, 462 U.S. at 238; United States v. Hodge, 246 F.3d 301, 305 (3d Cir. 2001).  To make this determination, we only look at the affidavits in support of probable cause.  See Hodge, 246 F.3d at 305.

On its face, the affidavit submitted in support of the application to search the Floyd residence provided the magisterial district judge a substantial basis to find probable cause.  In the affidavit, officer Wasserman summarized the events of the day officers Deniker and McDowell went to the Floyd residence to remove the elk carcass.  (See Defs.' Exs., Rec. Doc. No. 13, Ex. 1, Attach. 4.)  Wasserman (correctly) indicated in the affidavit that Robert Floyd sent a notarized letter to the PGC in which he admitted to shooting the elk.  (Id.; see also id. at Attach. 1.)  Subsequent lab analysis of the bullet removed from the carcass indicated the bullet was fired from a select class of firearms.  (Id. at Attach 4.)  Wasserman twice attempted to obtain the firearm through discussions with Robert Floyd's attorney, Robert Miller, Esquire, who indicated that he would try to obtain the firearm from Floyd.  (Id.)  Attorney Miller eventually told Wasserman that he no longer

-16-

represented Floyd and that he failed to obtain the firearm from Floyd.  (Id.)

The facts in the affidavit clearly suggest that Robert Floyd shot the elk with a certain type of firearm and that he likely still possessed the firearm.  Under the totality of the circumstances, a substantial basis existed for finding probable cause to search the Floyd residence.

The second and third affidavits, submitted in support of the applications to search Gavlock's residence and Pletcher's vehicle, also provided the magisterial district judge substantial bases to find probable cause.  Both affidavits indicate that, after failing to find the firearm at the Floyd residence, Wasserman learned from Jean Floyd that her husband sold the firearm to Gavlock so the firearm could not be seized by the PGC.  (Id. at Attach. 6.)  Robert Floyd conveyed the firearm (identified by make and serial number) to Gavlock for one dollar with a buyback option for the same amount.  (Id. at Attach. 5 & 6.)  Robert Floyd signed the agreement, as did his wife and Waltz as witnesses.  (Id.)  The agreement was dated the same day Wasserman last spoke with Attorney Miller.  (Id. at Attach. 6.)  Miller had informed Waltz, who in turn informed the Floyds, about the PGC's interest in obtaining the firearm.  (Id.)  Wasserman also indicated in the affidavit that both Waltz and Gavlock were members of CAEPPR and, through that association, had reason to be sympathetic to Robert Floyd's plight.  (Id.)

-17-

The third affidavit contains the same information as the second affidavit, as well as additional information indicating that, shortly after leaving the Floyd residence, Wasserman observed Gavlock as a passenger in a vehicle operated by Pletcher, another CAEPPR member.  They drove to and then entered Waltz's residence.  (Id. at Attach. 7.)  Wasserman believed this observation to be consistent, timing-wise, with Jean Floyd's calling Gavlock or Pletcher to tell them that the PGC was searching for the firearm so they could move or conceal it.  (Id.)

Given the sequence of events, a fair probability existed that the firearm was at Gavlock's residence or in Pletcher's vehicle.  The sales agreement conveying the firearm to Gavlock, and Jean Floyd's statements, strongly suggested that the firearm was in Gavlock's possession.  Further, Gavlock was seen shortly after the failed search of the Floyd residence heading towards Waltz's residence.  Waltz's involvement was apparent from his signing of the sales agreement, and his presence and behavior at the scene on the day the elk was shot.  It was reasonable to surmise that a fair probability existed that Gavlock and Pletcher may have been moving the firearm.  Overall, the totality of the circumstances show substantial bases existed for finding probable cause to search both Gavlock's residence and Pletcher's vehicle.

Finally, plaintiffs contend that the searches were somehow void *ab initio*

because it was unnecessary to obtain the firearm.  This contention is irrelevant to our review of the magisterial district judge's probable cause determinations.  Accordingly, we will grant summary judgment for defendants on the unlawful search claims.

## 4. Excessive Force Used Against Waltz

Plaintiff Waltz claims that officer Deniker used excessive force against him when Deniker restrained Waltz at the Floyd residence the day the elk was shot.  To establish an excessive force claim, Waltz must show that he was seized within the meaning of the Fourth Amendment and that the seizure was unreasonable.  Rivas v. City of Passaic, 365 F.3d 181, 198 (3d Cir. 2004).  A seizure occurs whenever an officer uses physical force or a show of authority to restrain a person's freedom to walk away, and a reasonable person would not feel free to walk away.  Florida v. Bostick, 501 U.S. 429, 434 (1991); Graham v. Connor, 490 U.S. 386, 395 n.10 (1989).  It is undisputed that Deniker restrained Waltz by holding him or putting him in a "bear hug."

Whether a seizure was reasonable is an objective inquiry made from the perspective of a reasonable officer on the scene, not from hindsight, and without regard to the officer's intent or motive.  See Graham, 490 U.S. at 396; Rivas, 36 F.3d at 198.  A number of pertinent factors should be considered, including but not

limited to the severity of the crime being investigated, the threat posed by the person seized, the duration of the seizure, and the number of persons with whom the officer must contend with at the time.  <u>Rivas</u>, 36 F.3d at 198.

The undisputed facts are that Deniker repeatedly told Waltz and others present that he was conducting an investigation and wanted to speak with the Floyds.  (<u>See</u> Rec. Doc. No. 12, at ¶¶38, 45, 49.)  Waltz repeatedly told the officers that the Floyds did not wish to be bothered in spite of Deniker stating that he needed to speak with Robert Floyd as part of the investigation.  (<u>Id.</u> at ¶¶35, 38, 42, 45.)  Waltz attempted to shut the outer door of the Floyd residence on Deniker.  (<u>Id.</u> at ¶43.)  Deniker blocked the door from closing and told Waltz that he was interfering with an investigation.  (<u>Id.</u> at ¶45.)  Deniker then placed Waltz in a bear hug.  (<u>Id.</u> at ¶¶46-47.)  Waltz resisted and tried to get loose.  (<u>Id.</u>)  Once Waltz stopped resisting, he was released. (<u>Id.</u>)  Deniker again told Waltz that he was interfering with an investigation.  (<u>Id.</u> at ¶¶46-47, 49.)

The only factual dispute is over whether Waltz sped up to get to the inner door to block Deniker's entry.  Waltz admitted at his deposition that he sped up to get to the outer door before Deniker, but he only did so to avoid a confrontation between the officers and the Floyds, and to get a camera to take a picture of the elk carcass.  (Rec. Doc. No. 13, Ex. 9, at 57.)  According to Waltz, after he tried to

close the outer door, he turned to go through the inner door but Deniker hit him "in the back with all his force," held him for more than an instant, and caused him some pain or injury.  (Id. at 60-61.)

Mindful that "[t]he reasonableness of the use of force is normally an issue for the jury," see Rivas, 365 F.3d at 198, we believe a reasonable jury could determine that Deniker used excessive force.  Therefore, we will not grant defendants' summary judgment motion as to Waltz's excessive force claim.

**5. Unlawful Imprisonment**

Plaintiffs Waltz, Gavlock, and Pletcher claim they were unlawfully imprisoned on Waltz's property on August 7, 2003.  That was the day officers Wasserman and Deniker, and Supervisor Stout maintained a position across the road from the Waltz residence and later searched Pletcher's vehicle and Gavlock's residence.

To state a claim for false imprisonment under § 1983 in violation of the Fourth Amendment, (as incorporated by the Fourteenth Amendment), plaintiffs must show that (1) a Fourth Amendment seizure occurred, and (2) the seizure was made without probable cause.  See Dowling v. City of Philadelphia, 855 F.2d 136, 141 (3d Cir. 1988).  As discussed above, a seizure occurs whenever an officer uses physical force or a show of authority to restrain a person's freedom to walk away,

and a reasonable person would not feel free to walk away.  <u>Bostick</u>, 501 U.S. at

434; <u>Graham</u>, 490 U.S. at 395 n.10.

The undisputed material facts establish that a seizure never occurred.  The

officers merely observed the Waltz residence and Pletcher's vehicle from a

distance; they never prohibited anyone from leaving.  (Rec. Doc. No. 12, at ¶¶92-

93.)  Prior to being surveilled, Gavlock walked away from Wasserman.  (<u>Id.</u> at

¶87.)  A number of people came and went to the residence during the period in

question without any interference by the surveilling officers.  (<u>Id.</u> at ¶¶90-93.)

These facts plainly show no seizure occurred – so plain, in fact, that

plaintiffs do not oppose defendants' motion in this respect.  For these reasons,

then, we will grant summary judgment for defendants on this claim.

## 6. Retaliation for Exercising First Amendment Rights

Plaintiffs claim defendants harassed, intimidated, and selectively prosecuted

them in retaliation for their speaking out against the PGC's elk policy and for

associating with a group (CAEPPR) that opposed PGC's elk policy.  To prove a

First Amendment retaliation claim, plaintiffs must show that: (1) they engaged in

protected activity; (2) defendants retaliated by taking adverse action against

plaintiffs; and (3) the protected activity was the cause of the retaliation.  <u>Marasco</u>,

318 F.3d at 512 (citing <u>Anderson v. Davila</u>, 125 F.3d 148, 161 (3d Cir. 1997)).

Plaintiffs can establish the first element.  They engaged in protected activity by speaking out against the PGC's elk policy and by associating with a group (CAEPRR) that opposed the policy.  They cannot establish the third element because they cannot show that their protected activity "was a substantial or motivating factor in the alleged retaliatory action."  Ambrose v. Township of Robinson, Pa., 303 F.3d 488, 493 (3d Cir. 2002).

The events material to this action only began to unfold when someone called the PGC to report the shooting of the elk at the Floyd residence.  (Rec. Doc No. 12, at ¶¶30, 33.)  The incident between Deniker and Waltz occurred because Waltz insisted on preventing Deniker from talking to the Floyds.  (Id. at ¶¶38-51.)  Robert Floyd was cited with a violation of § 2307(a) because he shot an elk without a license and because it appeared he did so without legal justification.  (Id. at ¶¶61, 72.)  The Floyd residence was searched because Robert Floyd would not turn over the firearm used to shoot the elk, even though he admitted to shooting it.  (Id. at ¶¶70-71, 77.)  The subsequent surveillance of the Waltz residence, and subsequent searches of Gavlock's residence and Pletcher's vehicle, were a result of Wasserman's learning that these individuals were concerting to hide the firearm. (Id. at ¶¶80-87.)

All of these events occurred without regard to plaintiffs' individual or

collective opposition to the PGC's elk policy.  The only references to CAEPRR came in the affidavits in support of the applications for search warrants to search Gavlock's residence and Pletcher's vehicle.  Gavlock and Waltz stated at their depositions that they never had any real problem with PGC personnel by virtue of their association with CAEPPR.  (Rec. Doc. No. 13, Ex. 9, at 120-21, 130-31; Ex. 10, at 70, 76-80.)  Robert Floyd did not even know if anyone knew he associated with CAEPPR.  (Id., Ex. 7, at 18.)

The undisputed material facts reveal an insufficient causal link between the protected activity and the alleged retaliation.  In their opposition brief, plaintiffs cite no supporting authority for their position.  They only make reference to other incidents that allegedly gave defendants motive to retaliate against plaintiffs.  These other incidents, unsupported by facts of record, are discrete from the events unfolding after Robert Floyd shot the elk.  Taking all of the above into consideration, the court finds that defendants are entitled to summary judgment on plaintiffs' First Amendment retaliation claim.

## 7. Whether Any Claim is Stated Against Defendant Ross

The parties also argue over whether any claim has been stated against defendant Vernon Ross, PGC Executive Director.  Plaintiffs' only reference to defendant Ross in their opposition brief is that he supervised and guided the other

defendants' actions.  Ross had no personal involvement in the underlying events of this case.  As such, no claim has been stated against Ross because *respondeat superior* liability will not lie in a § 1983 action.  See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).

## 8. Qualified Immunity

Qualified immunity is a two-step inquiry: (1) whether the facts allege a deprivation of an actual constitutional right, and if so, (2) whether the right was clearly established at the time of the alleged violation.  Saucier v. Katz, 533 U.S. 194, 200 (2001); Kopec v. Tate, 361 F.3d 772, 776 (3d Cir. 2004).  We already determined that a deprivation of a constitutional right may have occurred only in connection with Waltz's excessive force claim.  See supra Part III.4.  We therefore only need to consider the second step of the qualified immunity inquiry with respect to that claim.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Saucier, 533 U.S. at 202.  Deniker (and McDowell) confronted a situation wherein they repeatedly made it known to Waltz and others present that they were investigating the elk shooting and needed to speak with the Floyds.  (Rec. Doc. No. 12, at ¶¶38, 43, 45-47, 49.)  Waltz told the

officers that he spoke on behalf of the Floyds, that the Floyds did not want to talk, and that Deniker should speak with attorney Miller.  (Id. at ¶¶38, 42.)  When Deniker moved towards the outer door, Waltz sped up to get there first, and then tried to shut the door behind him.  (Id. at ¶43; Rec. Doc. No. 13, Ex. 9, at 57.)

By this point, a reasonable officer had ample reason to believe that Robert Floyd shot the elk in violation of 34 Pa. C.S.A. § 2307 and that Waltz was obstructing the investigation of the shooting, which itself is a summary offense.  See 34 Pa. C.S.A. § 904(a).  Given these circumstances, a reasonable officer would be justified in temporarily restraining Waltz.  Whether or not Deniker used excessive force to restrain Waltz is a separate question irrelevant to our qualified immunity analysis; the pertinent inquiry is whether a reasonable officer would think "the law clearly proscribed the actions" taken by Deniker.  Mitchell v. Forsyth, 472 U.S. 511, 528 (1985).

Even viewing all the facts in a light most favorable to Waltz, we do not believe a reasonable officer would believe the law clearly proscribed him or her from temporarily restraining a man who repeatedly said the subject of an investigation would not speak with the officer, and who sped up to get to the subject's house first and then tried to close the door on the officer.  As this is an objective determination, Waltz's subjective motives for his actions, such as his

assertion that he sped up to avoid a confrontation between the officers and the

Floyds and to get a camera to take a picture of the elk carcass, is irrelevant.  For

these reasons, we rule that Deniker is entitled to qualified immunity as a matter of

law as to Waltz's excessive force claim.

We also note that, were we not ruling in defendants' favor on plaintiffs' other

claims, we would rule in the alternative that defendants were entitled to qualified

immunity with respect to those claims.  Our above discussions of those claims

reveal that reasonable officers in defendants' positions would not believe their

actions violated clearly established rights.  Reasonable officers would not believe

so particularly in light of the existence of probable cause to cite Robert Floyd with

a violation of § 2307, and in light of the officers' having no reason to doubt the

validity of the search warrants for Floyds' residence, Gavlock's residence, and

Pletcher's vehicle.


## CONCLUSION:

For the above reasons, we find defendants are entitled to summary judgment

as a matter of law on all of plaintiffs' claims.  An appropriate order follows.

                                       <u>  s/ James F. McClure, Jr.     </u>
James F. McClure, Jr.
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ARHTUR GAVLOCK, ADAM | : | |
| WALTZ, JAMES P. PLETCHER, | : | |
| ROBERT FLOYD, and | : | No. 4:04-CV-0247 |
| JEAN FLOYD, | : | |
| Plaintiffs, | : | |
| | : | (McClure, J.) |
| v. | : | |
| | : | |
| WCO CLINT DENIKER, WCO | : | |
| WASSERMAN, WCO DOTY | : | |
| MCDOWELL, SUPERVISOR | : | |
| RONALD STOUT, and | : | |
| VERNON ROSS, | : | |
| Defendants. | : | |

**O R D E R**
May 27, 2005

For the reasons set forth in the accompanying memorandum,

**IT IS ORDERED THAT:**

1.      Defendants' motion for summary judgment (Rec. Doc. No. 11) is

granted.

2.      Final judgment is entered in favor of defendants and against plaintiffs.

3.      The clerk is directed to close the case file.

                                            s/ James F. McClure, Jr.
                                         James F. McClure, Jr.
                                         United States District Judge

Page 2 of  2